My name is Ralph Plymers. I'm here on behalf of the plaintiffs. I'd like to reserve three minutes for rebuttal. The issues before the court today are pure issues of law. The plaintiffs have challenged a logging project in eastern Washington and the northern Blue Mountains that proposes to log over 50% of all the logging that has occurred in the last 65 years in the entire Cumatilla National Forest. Could you keep your voice up? Yes. The issues are whether the Forest Service violated the National Environmental Policy Act and National Forest Management Act by proposing this 9,000 acre logging project. The legal issue before the court is one of consistency with past precedent. This court has ruled in a number of cases that the Forest Service must disclose the impacts, the significant impacts on specific roadless areas, whether they're unroaded and whether they're inventoried or whether they're 5,000 acres or greater in size or not. In this case, we have two roadless areas, Upper Cummins, which is adjacent to the Willow Springs IRA, which adds up to over 12,000 acres, and the West Tucanon, which is almost 5,000 acres in size. Those two areas have unique characteristics that were not analyzed as the district court admitted. What the district court failed to do was get the law right in its decision. The district court said that the Forest Service generically analyzed the impacts of the project and that that was sufficient even though the Forest Service nowhere disclosed the extent or the unique character of these roadless areas. These are uninventoried roadless areas, right? That's correct, Your Honor. And they're less than 5,000 acres per segment. Is that also correct? The one, Upper Cummins Creek, is roughly around 1,000 acres, but it's immediately adjacent and there's no separation from the Willow Springs IRA, so it forms one contiguous block of 12,000 acres. The other one, the West Tucanon, is just under 5,000 acres. It's roughly about 4,200 acres, so it's under 5,000 acres in size. Let me ask you this. The argument is that those areas, those uninventoried areas, that they have the potential to be designated wilderness areas. Is that what the whole argument is? No, Your Honor, that's not the argument. That's the way the Forest Service and the interviewers- Well, then I don't understand your argument, so you better explain it. I've tried to recast the argument. The issue under NEPA is that they must disclose the significant environmental effects of the project. And while these areas might be eligible for wilderness, we're not trying to get them designated as wilderness. No, I'm not saying you are, but I'm just saying that- We're just saying that they are eligible for wilderness. What we're saying, Your Honor, is that the roadless areas as identified by the Eastside Scientific Society panel have unique characteristics that contribute to the survival and recovery of native fish and wildlife. So those areas should be independently evaluated? Yes. And in the Smith case, the Austin case, and the Audubon Society case, those all get to those issues of whether- It's not an issue of whether they're eligible for wilderness or not, or whether they're supposed to be designated as an inventory roadless area. The issue is these areas, it's not just one acre is like another acre in the forest. These are unique strongholds for the survival and recovery, and they're intact. Okay. Here's my question, which is somewhat different, but related to Judge Pius' question. The discussion that is contained in the environmental impact statement is rather detailed in terms of its analysis of the areas to be logged, and they're shown on maps, and there's no secret about what areas these are. Would your argument be the same if they were named? I mean, is your complaint that the analysis doesn't take them into account because they're not named? No, Your Honor. It's a little bit more than that. I mean, it's important to identify them on a map to identify the amount of acreage, but it's also important for them to identify the unique characteristics, the context of that intact roadless area, what kind of habitat it provides, if that's of particular importance, the current condition of intact roadless areas in that greater watershed and how they're contributing to the survival and recovery of fish. This has been identified by the National Marines Fisheries Service as being critically important. At 528 of our excerpt of record is the executive summary of what is really sort of the primary report that was made to Congress at the request of a bipartisan panel that found that old-growth forests and intact roadless areas in the interior Columbia Basin have been seriously eroded and logged over the years, and that's why they made a number of recommendations, but two key ones that are before the Court today. One is the preservation of old, large trees, and the second is no construction of roads, whether they're called temporary as to use, they're not temporary as to their effects on the landscape. And so those recommendations were made, and these recommendations are key recommendations that have been understood by the Ninth Circuit in the Sierra Club v. Austin case, the Audubon case. If these concerns are not analyzed in a unique context of a roadless area, not just a naming exercise. What is our standard of review? You said that this is a question of law, but where there's no specific regulation, for example, as there would be if the areas were inventoried or if they were more than 5,000 acres, where there's no specific regulation or law that you can point to that says they absolutely had to do this and they didn't, how does our somewhat differential standard of review fit in with the fact that you can't point to something quite that precise? The standard of review requires this Court to look to see whether the district court made errors of the law. The district court did not analyze the analysis that the Forest Service conducted here, consistent with Smith, Austin, and other precedent of this Court, like Lands Council v. Powell, which says that they must consider every significant aspect of this project. It's not enough for the Forest Service to point to a sub-watershed map like it does in its brief and say that the analysis is in there. If you look at that sub-watershed map, it shows no existence of roads. It's not enough for them to just say, we identified where the harvest is, because the acres within the fire perimeter, they're not all the same. They're different, and the roadless areas are of particular importance, and they've been identified as such in the east side screens, which apply to... But let's leave the east side screens aside for a moment, but in your NEPA challenge, I have difficulty seeing where the clear error of law is, if that's our standard. There's some judgment to be applied to the extensiveness and nature of the discussion of these kinds of areas where there are less than 5,000 acres and not inventoried. So that's my struggle, is to fit that standard of review with the absence of a precise pinpoint requirement. Yes. Well, in response to that, I'll just say that the district court judge did determine that there were no large blocks of land where the undeveloped character of the area meets the minimum criteria that make them eligible as wilderness. That's clearly erroneous, because I can just tell you from my experience in Oregon right now, if this court would look on Thomas' website, there are areas being designated, proposed to be designated on the Mount Hood National Forest, that are 5,000 acres or less in size. In fact, there's about four of them that are in the House Bill H.R. But that is not a judgment that has been made with respect to these acres. I understand, but with the... By Congress, anyway. That's not a judgment that's been made by Congress. I'm just trying to give an example of there are wilderness areas being designated 5,000 acres or less in size, and the court found two things. One, he said that the district judge said that there was no analysis of the unique character of these areas. They just discussed the projects generally. But doesn't that assume that there was a unique character? I mean, once the report says what they're going to do and that they've analyzed what the effects of that are going to do, some value judgments which you've been expressing about the unique character and the significant effect, et cetera, might not be in the mind of the judge who's looking at it. He may disagree with you as to the significance or the unique character. Those are value judgments, are they not? Your Honor, that's an excellent question. I'm not here to make value judgments. Where this came from is from the Fish and Wildlife Service and from the National Marines Fisheries Service. I'll just quote really quick from what the Fish and Wildlife Service said about these unroaded areas. It says, let me quote, and this is from our brief at page 37. A widely held principle of managing for the survival and recovery of threatened and endangered aquatic species is that the remaining stronghold areas for the species in high-quality habitat be preserved and reconnected. Wilderness, unroaded, and large blocks of primitive lands contain most of the best available remaining habitat for steelhead and salmon. And that's from the 1998 bull trout biological opinion. And bull trout are a species that are highly sensitive. Now, does that statement apply directly to these areas that you're concerned about? This statement was made with respect to the biological opinion that covered these lands yesterday. Yes, Your Honor. These particular lands are included within that biological opinion. Yes, Your Honor. That's correct. And so there's a number of statements like this. They're in our briefing. They're in the Eastside report that identify these areas as having unique characters. So we're not making our own individual value judgments based on the guidance from the scientific community. Let me turn really briefly to the Eastside argument regarding the live old trees. In the preliminary injunction appeal that we made, an emergency appeal, one of the members of this court already ruled that live trees is a live tree, not a dead tree. And I just wanted to emphasize that. Just like the last case, there was no one-person viewpoint. Well, the Eastside direction says that it's a live remnant tree that currently exists and currently exists defined within Amendment No. 2 as something that's pre-activity. You know, what does not kill us makes us stronger is something that we use. But the same does apply generally to trees. I want to just point to one scientist that submitted evidence to the Forest Service during the administrative record, which is Dr. Waring. He's a professor emeritus from Oregon State University. And on page 194 of Volume 1, he says, Perhaps the largest mistake of the Scott Guidelines is that they ignore the substantial post-positive post-fire effects on Ponderosa pine. Rather than causing delayed mortality, fires that do not kill large Ponderosa pines frequently make them healthier. Large pines that survive fires can take advantage of substantial nutrient pulses and are freed from competition from smaller neighboring trees. I have been working with plaintiffs in eastern Oregon and Washington for some time to try to get the Forest Service to stop its new position, which is that it can log what it calls dying trees and that there's some new category. I have found that new category nowhere in the Amendment No. 2 to the Eastside screens that put the live tree protection. If you look at all the direction, if you look at the Eastside Scientific Society panel, it's all precautionary. Preserve as much as possible. So the idea that you can all of a sudden start predicting mortality in the future and get around the plain language is just not sufficient. By the way, do you know what the status of the log-in operations are? As far as I understand, they're ongoing, and perhaps you could ask Interviewee that question. Did you want to save a little rebuttal time? Yes, I want to save a little rebuttal time, and I just want to say that the key directions are in the Eastside screens, and I think if you look at them, the text, immediate text and the context, the plain language becomes clear and there is no ambiguity. Thank you. Thank you. We'll hear first from Mr. Shelton of the government. Thank you, Your Honor, and may it please the Court. I am representing the Forest Service, and I'm sharing my time with the intervener. I'm going to take about ten minutes. First, with regard to the roadless area issue, I think the controversy here is with respect to the extensiveness of the discussion in the EIS of these sort of unofficial undeveloped areas, which are inventory roadless areas. Did you misspeak? Do you mean inventoried or non-inventoried? Well, these are non-inventoried. Okay. All right. Thank you. And the EIS does contain a great deal of information about impacts on these areas, along with other areas that are not part of the inventory roadless area. It talks about effects on fisheries, possible sedimentation. It talks about the effects on solitude. How do we know that the discussion does encompass the area that he's talking about? Because I looked at the final EIS, and it's hard to visualize or to grasp that notion that you're just expressing. Right. Well, it does have the maps, which show exactly where the harvest is going to be, and locates these two areas. It's a little difficult because since they aren't officially inventory roadless areas, it's plaintiffs themselves who have drawn their own boundaries and called this the Upper Cummings Creek roadless area. That's their designation. That's not an official designation. It's just part of the general forest area that's analyzed in the EIS. But because the plaintiffs did raise this issue in response to the draft EIS, and they said, what about these areas? In response to that, the final EIS says, okay, we have considered the fact that these areas, while they're not inventory roadless, they are largely undeveloped, and so there will be some visual impacts to those. Your opportunities for solitude in those areas would be affected while the lumbering is going on. But at the same time, there's very little road work. It's temporary. Those roads will be decommissioned afterwards. And it makes clear that what's going on, the salvage harvest and the temporary roads, will not affect the possibility that later on sometime when the Forest Service is reconsidering the whole wilderness issue, these couldn't be reconsidered and maybe put in inventory roadless areas. They're not now. But I think it's important that the application of the NEPA test, you know, the good faith discussion to this discussion, it doesn't present an issue of law. It presents an issue of applying well-established law to a set of facts. And because of that, I think on a preliminary injunction appeal, this Court needs to give a lot of discretion and deference to the district court's own reading in a fairly quick way that it had to do, where he found that there was no abuse of discretion by the Forest Service here. So there's no clear legal error there. With regard to the east side screens issue, I want to just read that east side screen because I think the language is important. What it says is that the Forest Service shall, quote, maintain all remnant late and old cereal and or structural live trees larger than or equal to 21 inches dbh that currently exist within stands proposed for harvest activities. Now, what immediately jumps out at you, I think, is that this provision is using very technical language, the language of foresters. Non-foresters don't typically talk about old cereal stages and dbh and so forth. And so I think you have to understand the term live in that technical context. What does cereal mean? Pardon me? What does cereal mean? Cereal refers to the stage of a forest. And what they're talking about here largely is late and old cereal means basically an old growth forest. What they're trying to promote here is a forest which over time will become old growth. How does cereal differ from structural? Now you're getting into an area that I don't really... Because it says cereal or structural live trees. Yeah. And I think what it's meaning to say is that any tree, when it talks about remnant late and old cereal, it's, I think, talking about groups of or parts of the forest that are effectively old growth. And then the next phrase, talking about structural live trees, is basically trees that might become old growth. Or that's how it was explained to me anyway. But I confess I don't have a forester's understanding of these. We have no source of defined terms as to either cereal or old structural? I mean, there isn't some other regulation which tells us what those words mean? Not that I'm aware of and not in this record. But what we do have... And there's no regulation that defines live. There's no statute that defines live. No. No. There's not. And the common meaning of live, and our usual way of looking at statutes and regulations, is that if a term is not defined, we use ordinary terms or ordinary understanding of it. And live means not currently dead. Well, I would point out that this is not a regulation or statute. It's part of a forest plan. Right. And so it has to be followed, doesn't it? It does have to be followed. Okay. So that takes me back to my original question. Why isn't live simply not currently dead? Because foresters who wrote this and who apply it don't understand live in that way when it comes to trees, that a tree that is dying and is likely to be dead within two or three years is not considered a live tree by foresters. And that is shown by the way this has been consistently applied by the Forest Service. The very year that this came out, there was a directive from the chief forester from whom this comes, saying which made clear that dead or dying trees do not have to be preserved. But didn't, still didn't define live, which is actually what is in the plan. The word live is what's in the plan. Right. And there's no definition of live, per se. And a tree that is going to die in three years is still alive today. Not if you ask a forester. They don't consider it. Well, there is evidence of a contrary view to yours in this record. And there also, at least at the district court level, is at least one case that disagrees with this interpretation, correct? There is Judge King's opinion in the League of Wilderness Defenders. But I point out that that was a preliminary injunction appeal, and that in a later case, in Forest Service employees' case, when Judge King had the full record before him of how the Forest Service had applied this standard, he changed his mind because he said, I now see that foresters interpret live perhaps differently than a layperson might at first glance. And so he switched positions on that because he had the whole record. And I think the record is here. We've gone through it in our brief of how over the years since 1993, the Forest Service has interpreted this to mean that dying trees, you basically have, you know, you have clearly live trees on one hand, you have clearly dead trees on another. But you've got this gray area, and it calls for a scientific judgment of whether these particular trees, which were injured by the fire and are dying, whether they're going to survive or not. Because if they don't. I understand the policy argument you're making, but I don't understand how it's written on the screen, just the way it's worded. I mean, they could easily have said that, but they didn't. Well, I think, again, it's because it was written by foresters. I mean, if this were an act of Congress, we might take a different view because But foresters talk about live, dead, and dying. They could have divided it in three and said, here's how we're going to treat the dead ones, here's how we're going to treat the live, the clearly live ones, and here's how we're going to treat the in-between, but the screen doesn't say that. Well, they could have written that clearly, certainly, but I don't think, but I think that our task is still to get at what the intent was. Why don't they just amend the plan? They could do that. But as it stands now, this language is applicable to this plan and the other plans in the inter-Columbia Basin area, but it could be amended. But I think, again, that if you look at the purpose of this, the purpose is to promote old growth, and trees which are not going to survive don't promote that purpose. And Well, I think there's, as I understand it, there's some scientific disagreement about that. A tree that's going to live for three or five more years may serve some important purposes. I know such a tree may. Well, as I said, that snags, dead trees serve a purpose, and they're right, but snags are treated under a different section. And there's really no question that the Forest Service has met the requirement for dead trees here for cavity nesters. I don't want to take Yes, I assume it's true. I just want to sit down. Do you have any information that would differ from what the intervener has about the status of the logging operation? I think we're consistent on that. The one sale, the Millie sale, is about 75 percent complete, will be finished in about three weeks. The other two sales, the Son and Ollie sales, are less than 50 percent complete and won't be finished until midsummer. Okay. Thank you. So it's not moot. It sounds like everybody agrees it's not moot. No, it's not moot, Your Honor. And may it please the Court, on the issue of the You want to state your name for the record. I know you, but they don't, so. Scott Hortengren for the interveners. I think the difficult or the tough issue in this case is the live tree issue. And at first glance, you'd say, well, as you did, live means live. That's the end of the inquiry. What's the big deal here? And I don't think anybody here disputes that we're looking at did the district court apply the law correctly. And nobody disputes what the law is. It's the National Forest Management Act, 16 U.S.C. 1604I, which says you shall comply with your plan. And then we look at the plan and see if, as a matter of law, you're complying with it And I would argue that in looking at the plan, it's not a regulation, it's not a statute, and that this Court needs to interpret the plan in the context of the plan. And it can't just narrowly say we're going to look at the language on this page of the plan and ignore what the Forest Service has done in implementation of the plan and in monitoring of the plan. Well, I have a little bit of a problem with that because it is certainly theoretically possible for the Forest Service to have ignored the plan for a long time. So to say, it's like, you know, I always go 65 in a 55-mile zone, so why do you read 55 not to mean 65? So I guess I'm not really sure why we should read the words in the plan to rely on some later practice, rather than to just read the words. And I think the reason why is, and maybe this isn't quite an apt analogy, but in O'Neill v. United States, this Court was trying to deal with a contract issue in a particular trade. And there they said, Extrinsic evidence can be used to interpret the terms of a facially unambiguous written instrument based on trade usage. And here the Forest Service has consistently, from 1993 to 1998 to 1995 to 2005, interpreted that live term to mean dead or dying. And in fact, the record shows in this case, Your Honor, that Well, excuse me for just a second, though. It seems to me that the practice has been to include dying trees among those that are harvested. But I don't actually understand it to be that the dying trees are considered not alive. They're considered harvestable. Do you understand the point that I'm making? There's a policy judgment that they're harvestable, and that has been consistent. But I have yet to see anything that says outright live actually means a live tree that is dying. A live tree does not include a live tree that will die within a certain amount of time. This has been a the issue of a live tree and dying in a certain period of time, that's the issue. It's a temporal issue. The flower on the table says in the little plastic that I got it on, display until February 15th. In the context of tree, that's a dead flower. I can leave that on the table. It may stay there if the temperature here is mild for a while. Without shriveling up, it may go. But it has no roots, so it's a whole different question. And so what the foresters are trying to do is they're looking at the crown, they're looking at the bowl, and they're trying to assess the roots by looking, chopping into the bottom of the tree. And all Dr. Royce, plaintiff's expert in this case, said on the excerpt of record at 202 and 232, that trees with predicted survival rates of less than 25 percent are highly likely to die, making them potentially appropriate for harvest. And the studies that the Forest Service referred to and that Mr. Royce referred to, which are included in the EIS ---- But none of that says they're not alive. Yes, they do say they're not alive. And the issue in what they say and what the professional judgment issue is here, how do you make that determination? And that determination is important in the plan and the context of the plan because they're not going to come back in here for 20 or 30 years. And so they're going to go through once, and they're trying to make an assessment, should we take this tree now or not? And in terms of the publications ---- Well, some of the ones that are clearly alive may be dead in 30 years. I don't understand where that gets you. The ones that are clearly alive that may be dead in 30 years isn't what the Forest Service is trying to assess. They're trying to assess the trees that are not expected to die based on a probability. It is not a black and white question in the context of forestry live. It is not a black and white question. It is in the plan. The Forest Service has been monitoring the implementation of the plan, and the question comes up time and time again from the managers, should we save this tree as a snag, or should we cut it, or should we do something else for it? And the issue becomes, is that tree dead now, and how do you make that determination? For example, the research from 86 through 2000 talks about prediction of mortality in fire-damaged ponderosa pine, predicting post-fire mortality of seven western conifers. That's the Ryan and Reinhart paper that Mr. Royce, plaintiff's expert, relies on. And so this issue of predicting the mortality is important in the field of forestry, is important to the Forest Service, and we would suggest that a narrow, blinders, just look at the one sentence in the screens is not appropriate. When you look at the screens as they were adopted in 94, the regional forester in his decision notice explains there that we've had monitoring people trying to understand these complicated terms, and they have continued that throughout time, and we would argue that, as Judge King did, when he looked at this more thoroughly, and he looked at all these 1998 field reviews and these interpretation questions, concluded that he should defer to the Forest Service's interpretation. We'd argue that you should, too. Thank you. We have allowed your opposing counsel to go a bit over, so we'll give you another minute as well, so you'll have about two and a half minutes. The issue before this Court on the road list is whether this Court is going to issue a ruling that's consistent with its past precedents. Plaintiffs were before this Court before and were back again because the Forest Service won't incorporate the guidance from this Court in the Sierra Club v. Austin case and in other cases. Well, Austin was a memorandum disposition. That's correct. So why do you keep citing it? Citing it and the lands counsel, I think it's persuasive authority that this Court can reconcile that, but I believe that it's consistent with precedent from the lands counsel. That's supposed to be citing unpublished memorandum dispositions that were filed before. Before January 1st of 2007. As a related case, that's why we cited it under Rule 39-6. Are the parties the same? The parties were the same. It was the Sierra Club and the Forest Service, the exact same parties. And, in fact, Mr. Horngren argued that case for the intervener. But the parties were the same, and that's why we cited it. In any event, the lands counsel decision and Judge Paez, you asked a question about where's the guidance that requires us to consider the unique character of the roadless areas and how did the district court get it wrong? And I just wanted to provide one additional cite in response to that question, which is the guidance from the National Marines Fishery Service, which is in addition to the guidance that I cited earlier from the Fish and Wildlife Service. And that is stating that the National Marines Fishery Service said they would need detailed information on impacts to roadless areas greater than 1,000 acres to be able to assess the site-specific impacts when they're consulted with. And that's in their 1995 Biological Opinion that covers this area. Moving quickly to the east side panel, I just want to emphasize that the recommendation from the bipartisan panel that was empaneled by Congress to look at the depletion of old trees, the preservation of all trees, live or dead, 20 inches or greater. But then that was changed by the Forest Service to only apply to live trees. I've been practicing in this area of the law for about six years now. And about a couple years ago, clients came to me and said, and a whistleblower came to me and said, they're logging a lot of live trees that we do not think are dying. The Forest Service went into court and said, these trees are dying, Your Honor. Trust me, they're dying. Four years later, all those trees are still alive. Most mortality occurs within the two years after fire. Their mortality guidelines don't apply when it's a 21 inch or greater tree and they're incorrect and they have never been field verified and showed to us. Do you agree with the suggestion made by counsel for the intervener that with respect to the apply the meaning of live to animals or what the man on the street thinks is live, but what foresters mean by the term live, which can exclude dying trees. In other words, that the term live among foresters has achieved a trade usage. As he cited from the contract interpretation cases, which is standard state law, that the plain meaning rule takes a back seat to a meaning which has been acquired in the trade of practice through the use of extrinsic evidence. Do you agree with that concept? Your Honor, what I agree with is that the interpretation of the term live should be read in the text and context of Amendment 2, which has become the East Side Screens. Amendment 2? Amendment 2 is the, it was an amendment to the forest plan, and that's the document that generated the East Side Screens as they're commonly referred to. And so if you had to say what does live mean, what is your sentence? Live means? Not dead. And you would cite for that? And I would follow Judge King's ruling in the High Roberts case for that and your ruling. Judge King's ruling at the preliminary injunction rather than the interpretation of that. But didn't he change his mind, as was indicated by counsel? He relied on a guidance memo that relates to snag dead tree retention and whether trees will be killed by insects. He had that memo that he relied on, and I think he got it wrong in that subsequent in the Easy Fire case. He got it wrong in that case. He got it right in High Roberts. He ignored the plain language and saw ambiguity where there was no ambiguity. Are there experts who would define live the way you just did? Are there foresters? Yes. Richard Waring, if you look at his detailed submittals, which are part of the excerpt of record, he is an ecologist who has went out to the site at the High Roberts site and checked where the Forest Service uses this chopping method to look with their eyes to see whether the trees are, you know, dry at their cambium. He has checked those with more expert methods and found that they're still uptaking water and that they're living, and the green needles is the key indicator. Ponderosa pines are thick bark trees that have an incredible ability to survive fire. I have learned through this work that this is where the concept for the tiles on a space shuttle came from. In other words, they absorb massive amounts of heat, and the interior of the tree survives. The crown can be scorched. Up to 20 percent can be remaining, and these trees can still survive. So we should look at Richard Waring's statement. Yes, and he stated in the Eastside Scientific Society panel report on ER 528, it says that these large trees have exhibited the genetic characteristics to survive the full range of variation present in eastern and Oregon, Washington. In other words, high-severity fire, ground fire. And the... Your time has expired, so if you have one more sentence to sum up, you may, but... I think I've covered it. I think the Court understands. Thank you for your time. Thank you, Counsel. Thank both counsels. Thank you.
judges: Graber, Paez, Bea